**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RENEE KILLEBREW,

    Plaintiff,

        v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

    Defendant.

CIVIL ACTION NO. 3:15-cv-01415

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are Cross Motions for Summary Judgment filed by Plaintiff Renee Killebrew ("Killebrew") and Defendant The Prudential Insurance Company of America ("Prudential"). For the reasons that follow, Prudential's Motion (Doc. 23) will be granted and Killebrew's Motion (Doc. 26) will be denied.

### I. Factual Background[1]

#### A. The Parties

Plaintiff Renee Killebrew began working for J.P. Morgan Chase Bank, N.A. ("JP Morgan") on April 25, 2005, ultimately advancing to the position of vice president and branch manager. (Plaintiff's Statement of Facts ("PSOF") ¶ 27, Doc. 26-1; Defendant's

---

[1]    Local Rule 56.1 requires the nonmoving party's statement of facts to respond to the numbered paragraphs set forth in the moving party's statement. L.R. 56.1. The responsive statement "shall include references to the parts of the record that support the statements." *Id.* Plaintiff failed to submit a counterstatement of facts in response to Defendant's Motion and accompanying Statement of Facts. Additionally, Plaintiff's Statement of Facts in support of her own Motion (Doc. 26-1) contains assertions and conclusions that are unsupported by citations to the record. *See id.* Therefore, the Court will adopt Defendant's Statement of Facts that are supported by sufficient citations to the record, except for those facts clearly disputed by Plaintiff with adequate record references. *See* L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); *see also Smith v. Addy*, 343 Fed. Appx. 806, 808 (3d Cir. 2009).

Statement of Facts ("DSOF") ¶ 11, Doc. 25.) Killebrew's last day of work at JP Morgan was on January 27, 2012, after being diagnosed with multiple sclerosis ("MS"). (PSOF ¶ 27; DSOF ¶ 12; Defendant's Response to Plaintiff's Statement of Facts ("DR") ¶ 27, Doc. 31.) As an employee of JP Morgan, Killebrew participated in the JP Morgan Chase Long-Term Disability Plan (the "Plan"), which provided certain disability insurance benefits to eligible employees of JP Morgan if certain requirements were satisfied. (DSOF ¶ 1.) JP Morgan funded the long-term disability component of the Plan through the purchase of a group long-term disability insurance policy issued by Defendant Prudential. (PSOF ¶ 5.) JP Morgan is the sponsor of the Plan, and Prudential is the claims administrator. (DSOF ¶ 2.)

**B.    The Plan**

In order to receive long-term disability ("LTD") benefits under the terms of the Plan, a participant must be found to be "disabled." (PSOF ¶ 6.) Under the Plan, there are two distinct standards of "disability": (1) the Regular Occupation standard, and (2) the Any Gainful Occupation standard. (DSOF ¶¶ 3, 32.) A participant is deemed "disabled" under the Regular Occupation standard when she:

> (1)    Is unable to perform the material and substantial duties of her regular occupation due to her sickness or injury; and
> (2)    Is under the regular care of a doctor; and
> (3)    Has a 20% or more loss in her monthly earnings due to that sickness or injury.

(DSOF ¶ 3.) A participant is deemed "disabled" under the Any Gainful Occupation standard when, after receiving payments under the Regular Occupation standard for twenty-four (24) months, Prudential determines that due to the same sickness or injury the participant is:

> (1)    Unable to perform the duties of any gainful occupation for which she is reasonably fitted by education, training or experience; and
> (2)    Under the regular care of a doctor.

(*Id.*)

"Material and substantial duties" are defined as duties that "are normally required for the performance of your regular occupation and cannot be reasonably omitted or

2

modified." (*Id.*)

"Regular Occupation" is defined as "the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.*)

"Any Gainful Occupation" is defined as "an occupation, including self-employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: 80% of your indexed monthly earnings, if you are working; or 60% of your monthly earnings, if you are not working." (*Id.*)

Under the Plan, the claimant bears the burden of providing proof of disability. (Doc. 23-2, at 000144.[2]) The Plan contains the following proof statement with respect to making an initial LTD benefits claim submission:

> Your proof of claim, provided at your expense, must show:
>
> (a)    That you are under the regular care of a doctor.
> (b)    Appropriate documentation of your monthly earnings.
> (c)    The date your disability began.
> (d)    Appropriate documentation of the disabling disorder.
> (e)    The extent of your disability, including restrictions and limitations preventing you from performing your regular occupation or any gainful occupation.
> (f)    The name and address of any hospital or institution where you received treatment, including all attending doctors.
> (g)    The name and address of any doctor you have seen.

(*Id.*) The Plan also states that "[f]or your [LTD] claim, [Prudential] may request that you submit proof of continuing disability, satisfactory to Prudential, indicating that you are under the regular care of a doctor. In some cases, you will be required to give Prudential authorization to obtain additional medical information, and to provide non-medical information . . . as part of your . . . proof of continuing disability." (*Id.* at 000144-145.) The Plan further provides that Prudential may require claimants to be "examined by doctors,

---

[2]    Citations to the Administrative Record refer to the last six digits of the bates numbering.

other medical practitioners or vocational experts of [Prudential's] choice, [and that] Prudential will pay for these examinations." (*Id.* at 000128.) Prudential may also require a claimant "to be interviewed by an authorized Prudential Representative," and "[r]efusal to be examined or interviewed may result in a denial or termination" of a claim. (*Id.*)

Prudential enumerates several documents concerning the Plan, the content of which affects the Court's standard of review in this case.

First, Prudential relies on a document entitled the Health & Income Protection Program for JP Morgan Chase Bank and Certain Affiliated Companies (the "wrap document"). (DSOF ¶ 4.) Section 4.2 of the wrap document states in pertinent part:

> Benefits under the Program or a Plan will be paid only if the Program Administrator or its delegate decides in its discretion that a Participant is entitled to them. The Program Administrator may delegate this authority to . . . one or more Claims Administrators. . . . The Program Administrator and its authorized delegate(s) shall perform their duties, and, in their sole discretion, determine appropriate courses of action in light of the reason and purpose for which this Program is established and maintained.

(*Id.*) Section 4.3 of the wrap document states in pertinent part: "Whenever benefits under a Plan or Plan Option are provided under an insurance policy, the Insurer shall be the designated Claims Administrator for such benefits, and the Program, Program Administrator and the Committee assumes no liability or responsibility for any coverage or benefits provided under such Plan or Plan Option." (*Id.*) Prudential, as the insurer of the LTD component of the Plan, is thus defined and designated under the Plan as a "Claims Administrator" for and over its policy. (PSOF ¶ 21.)

Prudential also identifies the JP Morgan Chase Summary Plan Description ("SPD"), which states:

> The Plan Administrators for the JP Morgan Chase U.S. Benefits Program have complete authority in his or her sole and absolute discretion to construe and interpret the terms of the plans and any underlying policies and/or contracts, including eligibility to participate in the plans.
> . . .
> . . . the Plan Administrators have delegated their discretion to decide claims and appeals to the claims administrators . . .
> . . .
> The Plan Administrator has delegated all fiduciary responsibilities and decisions regarding a claim for a denied benefit under these plans to the applicable claims administrator.

4

(DSOF ¶ 7.)

Another document, which Prudential identifies as an "additional section at the end of the Certificate of Coverage," but instead appears to be part of the SPD (*see* PSOF ¶ 20; DR ¶ 20), states: "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." (Doc. 23-2, at 000156.)

**C.    Killebrew's LTD Benefits Claim**

**1.    Initial Denial and Appeal Under the Regular Occupation Standard**

On or about May 14, 2012, Killebrew filed her claim for LTD benefits based on her MS diagnosis. (DSOF ¶ 14; PSOF ¶ 27.) In support of her claim, Killebrew submitted records from Neurology Associates, including records from her neurologist, Dr. Katara, and diagnostic studies. (DSOF ¶ 15.) Prudential first requested an internal review by Susan Palermo, R.N. (*Id.* ¶ 16.) Nurse Palermo noted that the physical exams conducted by Dr. Katara "consistently noted normal gait w/symmetrical arm swing, no drift or gross focal weakness with motor testing and EE's upper/lower extremity strength has been 5/5." (Doc. 23-2, at 001592.) Nurse Palermo further noted that Killebrew was "consistently noted to be alert, oriented w/no indication of lethargy, slurred speech, balance/coordination abnormalities or an inability of EE to self-administer prescribed medications. . . ." (*Id.*) Additionally, Nurse Palermo stated that although Killebrew complained of not being able to use her right hand, on physical exams she was consistently found to have 5/5 upper strength with no motor/sensory abnormalities noted. (*Id.*) Nurse Palermo concluded that despite Killebrew's complaints of low energy, sleeping during the day, and an inability to use her right (dominant) hand, "there is no medical basis to restrict" her after June 1, 2012. (*Id.*; *see* DSOF ¶¶ 16-18.)

Relying on Nurse Palermo's assessment, Prudential denied Killebrew's LTD

benefits claim on July 30, 2012. (DSOF ¶ 19.) Prudential determined that Killebrew "would be capable of returning to work full time and [did] not meet the definition of disability. . . ." (Doc. 23-2, at 001507.) On August 12, 2012, Killebrew filed an appeal of Prudential's decision. (PSOF ¶ 30; DR ¶ 30.) Killebrew listed multiple ongoing issues stemming from her diagnosis that impacted her life, including an inability to drive, severe exhaustion, and various painful sensations and burnings. (Doc. 23-2, at 000364-365.) Killebrew also stated that Dr. James Kerrigan, M.D., Killebrew's treating neurologist, was the only doctor with whom she discussed her MS treatments, not Dr. Katara. (*Id.* at 000365; *see* PSOF ¶ 51.) Attached to the appeal letter was an office note from Dr. Kerrigan dated August 8, 2012, in which Dr. Kerrigan noted that Killebrew was, *inter alia*, "having pain symptoms most persistently in the right hand," experienced fatigue, and complained of difficulty focusing. (Doc. 23-2, at 000368.)

In response to Killebrew's appeal, Prudential requested an independent external review of the medical evidence. (DSOF ¶ 21.) Prudential contracted with MCMC to identify a doctor to conduct the review. (*Id.*) MCMC selected Dr. Michael D. Snyder, M.D., board certified in psychiatry and neurology, who conducted the review on September 12, 2012. (*Id.*) Dr. Snyder's review included a review of the records from Dr. Katara and Dr. Kerrigan. (*Id.* ¶ 22.) Based on the documentation provided, Dr. Snyder found that Killebrew had some medically necessary restrictions and limitations due to relapsing-remitting MS from January 28, 2012 forward. (Doc. 23-2, at 000384.) Dr. Snyder stated that this condition resulted in "some mild neurological deficits which support some degree of impairment and warrant restrictions/limitations. . . ." (*Id.*) However, Dr. Snyder concluded that these limitations did not prevent Killebrew from engaging in full-time work, stating:

> The claimant is capable of full-time work. Sitting is unrestricted in an eight hour day. The claimant may stand/walk combined up to two hours in an eight hour day; there is no limit on the amount of standing/walking at one time within those two hours. The claimant may lift, carry, push and pull with the left hand up to 20 pounds occasionally and up to 10 pounds frequently. The claimant may lift, carry, push and pull with the right hand up to 10 pounds occasionally. The claimant may finger, feel and handle with the right

> hand rarely (up to [3%] of the workday). As the claimant's ability to type/keyboard would be expected to be slower, the claimant should be allowed to work at her own pace and would need five minute breaks after every 30 minutes of typing/keyboarding. Reaching overhead, at the waist and below the waist with the right hand is limited to occasionally. . . .

(*Id.*) Dr. Snyder also found that Killebrew's complaints regarding her inability to drive long distances, inability to use her right hand without pain, and inability to perform detailed mental tasks were not supported by the documentation. (*Id.* at 000386.)

In connection with her appeal, Prudential also conducted a review of Killebrew's occupation. (DSOF ¶ 26.) Vocational rehabilitation specialist Karen Gibson, M.S., C.R.C., performed a review of Killebrew's position and duties on September 17, 2012. (*Id.*) Ms. Gibson concluded that the material and substantial duties of Killebrew's position as a branch manager were sedentary and required up to 33% of occasional fingering and frequent handling and reaching. (*Id.*)

Based on these two reviews, Prudential determined that Killebrew could not perform the material and substantial duties of her regular occupation as a branch manager because she had a 3% limitation on fingering and handling with her right hand and was unable to do bi-manual reaching. (*Id.* ¶ 27.) As a result, Prudential approved Killebrew's LTD benefits claim under the Regular Occupation standard effective July 28, 2012. (*Id.*)

On January 22, 2013, Prudential requested an addendum medical review from Dr. Snyder as part of Prudential's ongoing review of Killebrew's capacity and prognosis. (*Id.* ¶ 28.) Dr. Snyder reviewed additional medical records from Dr. Kerrigan and Dr. Mullen, Killebrew's psychologist. (*Id.*) Dr. Snyder concluded that Killebrew was:

> [L]imited to lifting with the left hand up to twenty pounds occasionally and ten pounds frequently. She would be limited to lifting with the right hand up to ten pounds occasionally. She could perform fingering/feeling/handling with the right hand occasionally and she may require accommodations or allowances for typing as typing will be slower than normal and she may require fairly frequent breaks. Reaching in all planes with the right hand would be limited to occasional. She would have no limitations with the left hand. [Killebrew] would have no restrictions on sitting. She could stand/walk up to two hours per day combined.

(Doc. 23-2, at 001239.) Dr. Snyder further opined that "[a]lthough [Killebrew]

reports neuropathic pain and sensory disturbance, and restrictions and limitations are supported, the contention that these symptoms would render her 'totally disabled' is not supported by the medical records. . . . Although [Killebrew] complains of self-reported cognitive difficulty, there is no clinical documentation of cognitive impairment in the medical records and thus no evidence of impairment in this regard." (*Id.* at 001240.) Based on this addendum review, Prudential extended Killebrew's LTD benefits on January 24, 2013 through the remainder of the Regular Occupation period of disability, which expired on July 27, 2014. (DSOF ¶ 31.)

### 2. Social Security Disability Benefits Application and Award

At the encouragement of Prudential, Killebrew applied for social security disability ("SSD") benefits in the Fall of 2012 and was referred by Prudential to Allsup, a social security consulting firm. (PSOF ¶ 34; DR ¶ 34; *see* Doc. 23-2, at 001176-1178.) The LTD benefits paid out by Prudential are reduced by any SSD benefits that a claimant receives. (Doc. 23-2, at 001176.) Prudential covered the fee owed to Allsup for assisting Killebrew with respect to her SSD benefits claim. (PSOF ¶ 35; DR ¶ 35.) The Social Security Administration ("SSA") approved Killebrew's claim for SSD benefits on August 7, 2014. (PSOF ¶¶ 39-40; DR ¶¶ 39-40.) The ALJ found that she "has been under a disability as defined in the Social Security Act since January 27, 2012, the alleged onset date of disability." (Doc. 23-2, at 001472.) The ALJ further concluded that Killebrew's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that [Killebrew's] statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible." (*Id.* at 001470.)

Upon receipt of the SSA's Notice of Award letter in favor of Killebrew dated December 9, 2014, which detailed the benefit amounts to be paid to Killebrew but did not contain the ALJ's rationale, Prudential moved to collect its overpayment on past benefits. (PSOF ¶ 41; DR ¶ 41.) Prudential did not receive the full decision

from the ALJ until May 2015. (PSOF ¶ 43; DR ¶ 43.) Killebrew continues to receive monthly SSD benefits. (PSOF ¶ 44; DR ¶ 44.)

### 3. Termination of Killebrew's LTD Benefits Under the Any Gainful Occupation Standard

After extending Killebrew's benefits through the Regular Occupation period, Prudential requested an internal employability assessment pursuant to Dr. Snyder's restrictions as part of its review of Killebrew's LTD benefits claim under the Any Gainful Occupation standard, which is triggered after the twenty-four month Regular Occupation period expires. (DSOF ¶ 32.) Vocational rehabilitation specialist Lindsay Neumann, M.S. Ed, C.R.C., conducted a review on January 24, 2013 to determine alternative positions that Killebrew might be able to perform. (*Id.*) Based on her review of Killebrew's experience, credentials, and the restrictions noted by Dr. Snyder, Ms. Neumann determined that Killebrew could perform three gainful occupations: (a) Manager–Brokerage Office; (b) Manager–Credit & Collection; and (c) Compliance Officer. (*Id.* ¶ 34.) On January 25, 2013, Prudential determined that it would terminate Killebrew's LTD benefits under the Any Gainful Occupation standard after the Regular Occupation standard expired because she could perform gainful occupations that fell within her restrictions. (*Id.* ¶ 35.)

On April 14, 2014, Prudential sent Killebrew a letter stating that "[a]fter careful review we have determined that no benefits are payable beyond July 27, 2014," which was the last day of the Regular Occupation period. (Doc. 23-2, at 001537.) The letter noted that "[w]hile the above outlined restrictions and limitations are supported, your reports of neuropathic pain and sensory disturbance rendering you unable to function in any gainful occupation are not clinically supported." (*Id.* at 001539.) As such, Prudential concluded that the medical record "did not support impairment that would prevent [Killebrew] from performing material and substantial duties of any gainful occupation." (*Id.* at 001540.)

On April 15, 2014, Prudential referred Killebrew's file for an updated employability

9

assessment in anticipation of this upcoming benefits termination. (DSOF ¶ 37.) Ms. Neumann conducted an updated assessment of Killebrew's restrictions and reached the same conclusion as to the three alternate gainful occupations. (*Id.*) Prudential also referred Killebrew's file to Nurse McCormack in June 2014 for an updated medical review. (*Id.* ¶ 38.) Nurse McCormack reviewed additional medical records from Dr. Kerrigan and Dr. Mullen, and opined that Killebrew had the same physical limitations as previously documented by Dr. Snyder in 2013. (*Id.* ¶¶ 38-39.) Nurse McCormack noted that there was no evidence that Killebrew's condition was worsening, that her condition was stable, and that the cervical and brain imaging showed no additional lesions. (*Id.* ¶ 39.) Based on her review, Nurse McCormack opined that Killebrew maintained the following restrictions: no lifting with the left hand over twenty (20) pounds occasionally and ten (10) pounds frequently, no lifting with the right hand over ten (10) pounds occasionally, fingering and handling with the right hand occasionally, and reaching in all planes of the right occasionally. (*Id.* ¶ 40.) The opinion also noted that "[t]here is no evidence of cognitive impairment. Fatigue is common with MS, however, due to the subjective nature of this complaint, it is difficult to quantify." (Doc. 23-2, at 001611.)

On June 27, 2014, Prudential made a final decision to terminate Killebrew's LTD benefits under the Any Gainful Occupation standard, effective July 28, 2014. (*Id.* ¶ 41.) Prudential informed Killebrew of this decision in a letter explaining its reasoning and identifying the three alternate gainful occupations dated June 27, 2014. (*Id.*)

**4.    Killebrew's Appeal of Prudential's Decision**

Killebrew first appealed Prudential's termination of her LTD benefits on July 23, 2014. (DSOF ¶ 44.) Killebrew did not submit any medical documentation with this appeal. (*Id.*) In response, Prudential requested another independent external review. (*Id.* ¶ 45.) Prudential again contracted with MCMC, who selected a different reviewer, Dr. Stephen M. Selkirk, M.D., PhD, and board-certified in psychiatry and neurology. (*Id.*) Dr. Selkirk conducted the review on October 14, 2014. (*Id.*) Dr. Selkirk concluded:

[Killebrew] reports subjective complaint[s] of fatigue, cognitive dysfunction

and pain. There is no objective data to support these complaints. Specifically, there is no formal neuropsychological evaluation to support cognitive impairment. . . . Furthermore, she notes no difficulty falling asleep at the encounter with Dr. Katara. This suggests that the pain is not impairing. If pain was significant, it would be expected to be a factor in her sleeping. She never mentions a problem with pain contributing to sleep at any encounter with Dr. Katara. With regards to the reported weakness, there is no weakness documented on Dr. Katara's examinations. Dr. Kerrigan on 07/25/2014 reports normal strength and no drift. She has a normal EMG. She has a stable MRI of the brain, cervical spine and thoracic spine from 2012 to 2014. Thus, there is no objective evidence to support any weakness. Her gait is documented as normal on nearly every encounter. There is no report of falls and no need for a gait assistive device. There is no consistent documentation of difficulty with fine motor movements. There is no documentation of incoordination.

(Doc. 23-2, at 001360.) Dr. Selkirk further found that:

With regards to pain, there is no significant escalation in treatment of pain to support impairing pain. Specifically, there is no referral to pain management. There is no addition of narcotic pain medication. Although there is some titration of medication it occurs very slowly, suggesting an absence of urgency.

(*Id.* at 001361.) Dr. Selkirk's review also opined that there was no objective data to support Killebrew's complaints of fatigue, concentration issues, muscle spasms, or urinary incontinence issues. (*Id.*) Specifically, Dr. Selkirk noted that there was no formal neuropsychological evaluation to support a claim of cognitive impairment, Killebrew was not being treated with any anti-spasmotic agents, there was no documented incidents of spasms on any encounter over a two-year period, and there was no objective evidence to support a finding that MS caused any bladder dysfunction.[3] (*Id.*) In summation, Dr. Selkirk concluded that Killebrew "does not have any medically necessary restrictions and/or limitations from 07/28/2014 forward," and that "[t]here is no evidence to support any 'disability.'" (*Id.* at 001360, 001362; DSOF ¶ 52.) As a result of Dr. Selkirk's review, Prudential upheld its decision to terminate Killebrew's LTD benefits under the Any Gainful Occupation standard on October 15, 2014. (DSOF ¶ 54.)

---

[3]     Dr. Selkirk suggested that Killebrew's obesity and diabetes might be the cause of any bladder issues she was experiencing. (Doc. 23-2, at 001361.)

On April 14, 2015, Killebrew, now represented by counsel, submitted a second appeal, arguing that Killebrew meets the definition of "disabled" under the Any Gainful Occupation standard. (Doc. 23-2, at 001394.) Attached to the appeal letter was: (a) an April 2, 2015 letter by Dr. Kerrigan opining that Killebrew "is totally and permanently disabled, [and] is unable to consistently work a 40 hour week even in a light duty or sedentary capacity as a result of" her MS (Doc. 23-2, at 001401); (b) an independent medical exam ("IME") report by Dr. David Sirken, D.O., board certified in neurology, opining that Killebrew's "functional impairments[,] cognitive dysfunction and mental fatigue are of such severity so as to prohibit her from performing full-time employment, even of the sedentary type" (*id.* at 001406); (c) a March 3, 2014 MRI confirming a "[p]ersistent small nonenhancing spinal cord lesion suspicious for [MS]" (*id.* at 001409); (d) a February 17, 2015 cervical spine MRI which confirmed spinal cord lesions suspicious for MS (*id.* at 001412); and (e) a February 17, 2015 brain MRI which confirmed a "single tiny left mid frontal deep white matter T2 and FLAIR hyperintense focus consistent with mild chronic microangiopathic changes, MS or Lyme disease" (*id.* at 001415; *see* PSOF ¶ 48.). Additionally, Killebrew submitted a personal statement describing how her MS-related symptoms impacted her life. (PSOF ¶ 54.) By a letter dated May 11, 2015, Killebrew also provided the ALJ's decision in her social security disability case as part of her appeal. (*Id.* ¶ 49.) Prudential did not interview or otherwise contact Killebrew during the pendency of her appeal. (*Id.* ¶ 62; DR ¶ 62.)

In connection with Killebrew's second appeal, Prudential requested Dr. Selkirk to conduct a follow-up medical review that considered the additional records Killebrew submitted along with her appeal letter. (DSOF ¶ 56.) Dr. Selkirk's report noted that he reviewed the additional records and documents submitted by Killebrew. (Doc. 23-2, at 001475-1476.) After conducting this follow-up review, Dr. Selkirk opined that his original opinion had not changed, and that Killebrew did not have any medically necessary restrictions and/or limitations from July 28, 2014 forward. (*Id.* at 001477.) Dr. Selkirk noted that the IME conducted by Dr. Sirken found Killebrew had normal speech and

strength, and he reiterated that self-reported complaints of cognitive impairments had not been verified by objective neuropsychological testing. (*Id.* at 001476.) Dr. Selkirk also considered that Dr. Kerrigan's letter noted that Killebrew has never had an exacerbation of her MS. (*Id.*) Dr. Selkirk's review of the updated MRIs concluded that her MS was stable, and he reiterated that Killebrew's disease had been stable "on every MRI in the medical record." (*Id.*) The follow-up review further noted that although fatigue and cognitive impairment are common in MS patients, they are not "universal feature[s] of the disease and certainly would not be expected in someone with such minimal MRI disease burden." (*Id.*) Dr. Selkirk stated that the social security ALJ's rationale did not affect his previous opinion, and concluded that "[t]here remains no evidence of impairment and no evidence of active neurological disease." (*Id.* at 001477.)

In a letter dated June 4, 2015, Prudential informed Killebrew that it was upholding its decision denying her LTD benefits under the Any Gainful Occupation standard. (DSOF ¶ 60.) The letter outlined Prudential's reasons for upholding its decision, and specifically noted that "the medical information provided did not warrant any restrictions or limitations which would support the need for additional [in person] testing, [Killebrew's] physicians had not ordered additional testing, and [Killebrew's] policy indicates proof of claim is to be provided at her expense." (Doc. 23-2, at 001584; *see* DSOF ¶ 62.) Prudential concluded that "there is no need for any medically necessary restrictions or limitations as [Killebrew] presents with a stable gait, stable brain, thoracic, and cervical MRIs, has never had an exacerbation of her [MS] according to Dr. Kerrigan, and no clinical or radiographic evidence of any disease process." (Doc. 23-2, at 001584.)

On July 21, 2015, Killebrew filed the instant lawsuit. (Doc. 1.)

## II. Legal Standards

### A. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made

in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

In order to prevail on a motion for summary judgment, the non-moving party must show "specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). Although the non-moving party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, "[t]he summary judgment standard does not change when, as here, the parties have filed cross-motions for summary judgment." *Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 509 (D.N.J. 2008) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)), *aff'd*, 352 Fed. Appx. 642 (3d Cir. 2009). "Such motions are no more than a claim by each side that it alone is entitled to summary judgment. . . ." *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (internal quotations omitted). Thus, "when presented with cross motions for summary judgment, the Court must consider the motions separately, and view the evidence presented for each motion in the light most favorable to the nonmoving party." *Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d. 418, 433 (M.D. Pa. 2014) (internal citations omitted).

**B.    ERISA Standard of Review**

ERISA provides that a plan participant or beneficiary may bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A claim challenging the termination of benefits brought under §

1132(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, the court reviews such decisions under an "abuse of discretion" or "arbitrary and capricious" standard of review.[4] *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). "Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan." *Luby v. Teamsters Health, Welfare, & Pension Tr. Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991). As explained by the Third Circuit, "[t]here are no 'magic words' determining the scope of judicial review of decisions to deny benefits, and discretionary powers may be granted expressly or implicitly." *Viera*, 642 F.3d at 413. "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies." *Id.* (internal quotation marks and citation omitted).

Thus, when an administrator proves that the terms of the plan grant the administrator discretionary authority, "trust principles make a deferential standard of review appropriate, and [the Court] review[s] a denial of benefits under an 'arbitrary and capricious' standard." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012) (internal citations, quotation marks, and alterations omitted). This standard is also applied to an administrator's interpretation of the terms of the plan and findings of fact, pursuant to her authority to interpret such terms or act as a fact-finder. *See id.*

---

[4]    "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011) (*citing Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010)). Accordingly, the phrase "abuse of discretion" and "arbitrary and capricious" are often used interchangeably when referring to the deferential standard of review applicable when an administrator is granted discretionary authority under the plan. *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 n.2 (3d Cir. 2012).

"An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (quoting *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). "An administrator's interpretation is not arbitrary if it is 'reasonably consistent with unambiguous plan language.'" *Fleisher*, 679 F.3d at 121 (quoting *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001)). Additionally, under this "extremely deferential" standard, *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), courts must defer to an administrator's findings of fact "when they are supported by 'substantial evidence.'" *Fleisher*, 679 F.3d at 121. "Substantial evidence" is "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Soubik v. Dir., Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004).

In determining whether a plan administrator acted arbitrarily and capriciously, courts weigh both structural and procedural factors. The structural inquiry considers "whether a conflict of interest existed." *Uqdah v. Unum Life Ins. Co. of Am.*, No. 14-6367, 2015 WL 5572678, at *5 (D.N.J. Sept. 21, 2015) (citing *Miller*, 632 F.3d at 844-45). While the existence of a structural conflict "may be determinative where the issue is close," *Fleisher*, 679 F.3d at 127 n.6 (citing *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009)), courts "consider any structural conflict of interest as one of several factors." *Viera*, 642 F.3d at 413. Additionally, courts must also undertake a procedural inquiry, which "focuses on how the administrator treated the particular claimant." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007), *overruled on other grounds by Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522 (3d Cir. 2009).

### III. Discussion

On July 21, 2015, Killebrew filed the instant Complaint, raising one count that alleged Prudential's decision to terminate her LTD benefits was arbitrary and capricious under ERISA § 1132(a)(1)(B). (Doc. 1.) Prudential filed its Answer on September 1, 2015.

(Doc. 9.) On June 15, 2016, the parties filed Cross Motions for Summary Judgment and accompanying Statements of Facts. (Docs. 23, 25, 26, & 26-1.) Prudential filed its Brief in Opposition and Response to Killebrew's Statement of Facts on July 6, 2016. (Docs. 30 & 31.) Killebrew filed her Brief in Opposition on June 29, 2016, but did not submit a response to Prudential's Statement of Facts. (Doc. 29.) Prudential filed its Reply Brief on July 13, 2016. (Doc. 32.) The Motions are ripe for disposition.

## A. Prudential's Motion for Summary Judgment

In support of its Motion for Summary Judgment, Prudential argues that the Court should apply the deferential arbitrary and capricious standard of review, and find that Prudential's denial of Killebrew's LTD benefits claim under the Any Gainful Occupation standard was based on substantial evidence and not an abuse of discretion. (*See* Doc. 24, at 1.)

### 1. The Arbitrary and Capricious Standard of Review Applies

Relying primarily on the Plan documents noted above, Prudential argues that the Plan expressly grants Prudential discretion to interpret the Plan and decide claims for LTD benefits, and therefore its decision to uphold its termination of Killebrew's LTD benefits should be reviewed under the arbitrary and capricious standard of review. (*See* Doc. 24, at 4-8.) Indeed, another district court found these same plan documents "plainly sufficient" to grant Prudential discretion. *See Johnson v. Prudential Co. of Am.*, No. 2:11-cv-664, 2012 WL 5378313, at *4 (S.D. Ohio Oct. 31, 2012) (concluding the language in Section 4.2 of the wrap document was "plainly sufficient to grant [Prudential] discretion"); *see also, e.g.*, *Strott v. Dimensional Inv., LLC Health & Welfare Plan*, No. 2:13-cv-1245, 2015 WL 1299773, at *9 (W.D. Pa. Mar. 23, 2015) (finding language in a wrap document granting Prudential as claims administrator "all discretionary authority and control over the administration of the Plan and [ ] sole discretionary authority to determine eligibility for Plan benefits and to construe the terms of the Plan" sufficient to trigger the arbitrary and capricious standard). The Court agrees, and finds the language in the wrap document sufficient to "communicate the idea that the administrator not only has broad-ranging

18

authority to assess compliance with pre-existing criteria, but also has the power to interpret the rules, to implement the rules, and even to change them entirely." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 417 (3d Cir. 2011).[5]

In attempting to dispute the applicable standard of review, Plaintiff asserts that the Plan itself contains no express grant of discretion to Prudential and argues that the SPD's grant is insufficient. (*See* Doc. 29, at 8-9.) With respect to the SPD, the Supreme Court has specifically concluded that summary documents "do not themselves constitute the *terms* of the plan for purposes of [ERISA] § 502(a)(1)(B)." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis in original). Here, however, the plain language in the actual Plan documents[6] grants Prudential discretionary authority. Section 4.2 of the wrap document states: "Benefits under the Program or a Plan will be paid *only if the Program Administrator or its delegate decides in its discretion that a Participant is entitled to them*. The Program Administrator may delegate this authority to . . . one or more Claims Administrators." (Doc. 23-2, at 000014) (emphasis added). This Section further states that "[t]he Program Administrator and its authorized delegate(s) shall perform their duties, and, *in their sole discretion*, determine appropriate courses of action in light of the reason and purpose for which this Program is established and maintained." (*Id.* at 000015) (emphasis added). Section 4.3 of the wrap document informs that whenever benefits under a Plan or Plan Option are provided under an insurance policy, as is the case here, "*the Insurer shall be the designated Claims Administrator for such benefits*, and the Program, Program Administrator and the Committee assume[] no liability or responsibility

---

[5]     The Third Circuit expressly noted that the following "safe harbor" language would be sufficient to grant an administrator discretionary authority: "Benefits under this plan will be paid only if the plan administrator decides in [its] discretion that the applicant is entitled to them." *Viera*, 642 F.3d at 417 (quoting *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000)).

[6]     Plaintiff does not dispute that the wrap document constitutes the terms of the Plan. (*See* Doc. 29, at 8 (Plaintiff citing to the wrap document and referring to this document as "[t]he Plan itself").)

for any coverage or benefits provided under such Plan or Plan Option." (*Id.*) (emphasis added).

Therefore, because the claims administrator in this case is Prudential, the Plan documents clearly grant Prudential discretion to decide whether Killebrew is entitled to LTD benefits irrespective of the SPD. *See Johnson*, 2012 WL 5378313, at *4 (concluding that, regardless of whether the Plan documents "formally effects a delegation from JPMorgan Chase to Prudential," the wrap document and plan contract together clearly demonstrate that such a delegation has in fact occurred); (*see also* PSOF ¶ 21 (conceding that Prudential is defined and designated as claims administrator under the Plan).) As such, Prudential has met its burden, and the Court will apply the arbitrary and capricious standard of review.

**2.    Prudential's Decision to Terminate Killebrew's Claim for LTD Benefits Under the Any Gainful Occupation Standard**

Killebrew contends that Prudential's decision to terminate, and ultimately uphold the termination, of her LTD benefits claim was arbitrary and capricious. Specifically, Killebrew argues that Prudential failed to: (1) conduct an IME and engage in other standard claim practices; (2) give any weight to her treating physicians and in-person examiners; (3) adequately consider the decision of the social security ALJ; and (4) consider her subjective symptoms. (*See* Doc. 27, at 7-15; Doc. 29, at 3-8.) Killebrew also argues that (5) Prudential operated under a structural conflict of interest that tainted its decision and should result in a lessening of the deference afforded to its decision. (Doc. 27, at 3-4; Doc. 29, at 3, 5.)

**a.    Structural Conflict of Interest**

Killebrew is correct that Prudential operated under a structural conflict of interest in this case because it "both determines eligibility and then also pays disability benefits." *Moncak v. Liberty Life Assur. Co. of Boston*, No. 3:15-cv-01998, 2017 WL 1196514, at *10 (M.D. Pa. Mar. 31, 2017) (quoting *Swiger v. Hartford*, No. 08-cv-1387, 2009 WL 1248080, at *4 (W.D. Pa. Apr. 30, 2009)). Prudential does not dispute the existence of

this conflict. (*See* Doc. 30, at 6-7.) However, even when a structural conflict exists, courts must nevertheless apply the "deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008)). This factor is afforded greater weight "where the evidence suggests a greater likelihood that it affected the decision to deny benefits." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 794 (3d Cir. 2010). Conversely, "[a]bsent evidence of bias in this or other cases, the inherent conflict that arises when an insurance company plan administrator both determines eligibility and then pays disability benefits is not strong." *Moncak*, 2017 WL 1196514, at *10; *see Bluman v. Plan Adm'r & Trs. for CNA's Integrated Disability Program*, 491 Fed. Appx. 312, 315 (3d Cir. 2012). Thus, courts should give this factor an appropriate degree of weight based on how strongly the evidence indicates that this conflict in fact "infected the particular decision at issue." *Moustafa v. Reliastar Life Ins. Co.*, No. 15-2531, 2016 WL 6662685, at *6 (D.N.J. Nov. 8, 2016) (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 164 (3d Cir. 2007)).

Killebrew, however, offers no evidence demonstrating that this structural conflict had an impact on Prudential's decision to terminate her LTD benefits. Indeed, Killebrew essentially admits to the absence of evidence on this point in her Brief. (*See* Doc. 27, at 4.) As such, the Court recognizes the existence of a structural conflict, but will accord this factor little weight in evaluating whether Prudential abused its discretion in denying Killebrew's claim for LTD benefits under the Any Gainful Occupation standard. *See Moncak*, 2017 WL 1196514, at *10.

### b.    Procedural Factors

The Court next reviews pertinent procedural factors in assessing whether an administrator's decision was arbitrary and capricious. Courts in this Circuit frequently consider the following factors:

(1) a reversal of a benefits determination without additional evidence, (2) a

21

> disregard of opinions previously relied upon, (3) a self-serving selectivity in the use of evidence or reliance on self-serving paper reviews of medical files, (4) a reliance on the opinions of non-treating physicians over treating physicians without explanation, (5) a reliance on inadequate information or incomplete investigation, (6) failure to comply with the notice requirements of Section 504 of ERISA, (7) failure to analyze all relevant diagnoses, and (8) failure to consider plaintiff's ability to perform actual job requirements.

*Kosiba v. Merck & Co.*, No. 98-3571, 2011 WL 843927, at *10 (D.N.J. Mar. 7, 2011) (citing *Miller v. Am. Airlines, Inc.*, 632 F.3d 837 (3d Cir. 2011)). These factors are non-exhaustive, and those which are relevant will be considered by the Court along with the pertinent case-specific factors raised by Killebrew.

### i.    Prudential's Termination of Killebrew's LTD Benefits Under the Any Gainful Occupation Standard

First, the Court notes that Prudential did not reverse its benefits determination without additional evidence while operating under the same standard of disability. Instead, Prudential's decision to deny Killebrew's continuing receipt of LTD benefits, and its subsequent decision to uphold this denial on appeal, were based in large part on an anticipated change in the definition of "disability" under the Plan–that is, a switch from the Regular Occupation standard to the Any Gainful Occupation standard. (*See* DSOF ¶ 41.) Per the terms of the Plan, the Any Gainful Occupation standard is triggered after a claimant receives LTD benefits under the Regular Occupation standard for twenty-four months. (Doc. 23-2, at 000128.) Whereas the Regular Occupation standard is satisfied if the claimant is unable to perform the "material and substantial duties" of the job she held prior to her sickness or injury, the more rigorous Any Gainful Occupation standard is met only if the claimant is unable to perform the duties of "any gainful occupation" for which she is reasonably fitted due to the same sickness or injury. (*Id.*) A "[g]ainful occupation means an occupation, including self-employment, that is or can be expected to provide [a claimant] with an income within 12 months of [claimant's] return to work, that exceeds . . . 60% of [claimant's] monthly earnings, if [claimant is] not working." (*Id.* at 000130.) Accordingly, it is not necessarily unreasonable for an administrator to find that a particular claimant is eligible for LTD benefits under the Regular Occupation standard yet ineligible

22

for such benefits under the Any Gainful Occupation standard without any new or additional evidence. Indeed, "[c]ourts in this Circuit have repeatedly upheld an administrator's termination of LTD benefits when the test changed from 'own occupation' to 'any occupation' because the standard for continued payments of benefits is more rigorous under the 'any occupation' test." *Hoch v. Hartford Life & Accident Ins. Co.*, No. 08-4805, 2009 WL 1162823, at *17 (E.D. Pa. Apr. 29, 2009) (citing cases).

Accordingly, considering the definitional change under the Plan, the Court does not find that Prudential reversed its earlier benefits decision without any new legitimate basis. Instead, the Court finds that Prudential's decision to terminate Killebrew's continued receipt of LTD benefits based on the anticipated change to a more "rigorous" definition of "disability" weighs heavily in favor of Prudential.

### ii.  The Opinions of Killebrew's Treating Physicians

Killebrew contends that Prudential failed to give any weight to the opinions of her treating physicians and thus acted arbitrarily and capriciously. (Doc. 27, at 12-13; *see* Doc. 29, at 2-3.) As noted above, in support of her second appeal challenging Prudential's decision, Killebrew submitted, *inter alia*, (a) an April 2, 2015 letter from Dr. Kerrigan, M.D., her treating neurologist, opining that Killebrew "is totally and permanently disabled, [and] is unable to consistently work a 40 hour week even in a light duty or sedentary capacity as a result of this condition" (Doc. 23-2, at 001401); and (b) an IME report by Dr. David, Sirken, D.O. and board certified in neurology, opining that Killebrew's "functional impairments[,] cognitive dysfunction and mental fatigue are of such severity so as to prohibit her from performing full-time employment, even of the sedentary type." (*Id.* at 001406).

"ERISA does not require that plan administrators give the opinions of treating physicians special weight." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 166 (3d Cir. 2007), *overruled on other grounds by Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522 (3d Cir. 2009). Indeed, the Supreme Court has instructed that "courts have no warrant to require administrators automatically to accord special

weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see Addis v. Ltd. Long-Term Disability Program*, 425 F. Supp. 2d 610, 617 (E.D. Pa. 2006), *aff'd*, 268 Fed. Appx. 157 (3d Cir. 2008) ("[I]f the consultant's conflicting opinion is based on *reliable evidence*, it can support a determination contrary to that of a treating physician. . . .") (emphasis added). "[A]n ERISA plan administrator does not abuse its discretion by resolving conflicts in medical records and concluding that a plaintiff is not disabled." *Hoch v. Hartford Life & Accident Ins. Co.*, No. 08-4805, 2009 WL 1162823, at *14 (E.D. Pa. Apr. 29, 2009). Indeed, "[i]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." *Giertz-Richardson v. Hartford Life & Accident Ins. Co.*, 536 F. Supp. 2d 1280, 1291-92 (M.D. Fla. 2008) (quoting *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004)).

Here, the record presents conflicting conclusions from medical experts. In support of her claim on appeal, Plaintiff chiefly relies on three sources of documents furnished by her doctors: the letter by Killebrew's treating neurologist, Dr. Kerrigan; a report provided by an independent medical examiner, Dr. Sirken; and progress notes from Dr. Sharon Cline, M.D., Killebrew's family physician. Both Drs. Kerrigan and Sirken opined that Killebrew is unable to consistently work full-time, even in a sedentary capacity. (Doc. 23-2, at 001401, 1406.) Notably, however, Dr. Kerrigan's letter opines that some of Killebrew's symptoms "have improved[,] such as the dexterity of her hand and her balance, but have not returned back to baseline." (Doc. 23-2, at 001401.) The letter further notes that "[t]o date[,] [Killebrew] has not had a flare up of her MS but, despite medication is at risk for having exacerbations and the potential for increased disability." (*Id.*) As

to Dr. Sirken's IME report, interestingly the report repeatedly refers to Killebrew's questionable ability to perform the "material and substantial duties" of her pre-injury vocation as a branch manager, despite the fact that the Regular Occupation standard no longer governs her eligibility to receive LTD benefits. (*See id.* at 001406.) Indeed, the report concludes that "Mrs. Killebrew's prognosis regarding the likelihood of returning to her preinjury, banking career is extremely poor in light of her extensive medical, neurological, and cognitive conditions when taken in their totality." (*Id.*) However, that was not (and is not) the relevant "disability" inquiry under the terms of the Plan. Finally, the progress notes of Dr. Cline reported that although Killebrew complained of fatigue, she was, *inter alia*, "alert and oriented" (*id.* at 001652), and consistently found to be "negative for arthralgia, myalgia, back pain, [and] muscle cramps," as well as "negative for weakness, paresthesia, headache, dizziness, [and] tremor" (*id.* at 001651, 001653, 001655, 001659, 001661).

On the other side, Prudential primarily relies on independent external reviews conducted by: Dr. Snyder, board certified in psychiatry and neurology, on September 12, 2012 and January 22, 2013; Nurse McCormack in June 2014; and Dr. Selkirk, board certified in psychiatry and neurology, on October 14, 2014 and May 26, 2015. (DSOF ¶¶ 21, 28, 38, 45, 56.) Additionally, Prudential relies on the internal employability assessments conducted by Ms. Neuman, a vocational rehabilitation specialist, on January 24, 2013 and April 15, 2014, which determined three gainful occupations Killebrew could perform based on her experience, credentials, and the restrictions outlined by Dr. Snyder. (*Id.* ¶¶ 32, 37.)

Dr. Snyder's January 22, 2013 report reiterated certain restrictions and limitations based on Killebrew's condition, but opined that there was no support in the medical records for the contention that Killebrew's reports of neuropathic pain and sensory disturbance rendered her "totally disabled." (Doc. 23-2, at 001239.) The report further opined that "there is no clinical documentation of cognitive

25

impairment in the medical records and thus no evidence of impairment in this regard." (*Id.*) Dr. Snyder noted his disagreement with Dr. Kerrigan's opinion that Killebrew was "totally disabled" due to pain, fatigue, and cognitive defects. (*Id.* at 001240.)

Nurse McCormack conducted a review in June 2014, which included a review of additional records submitted by Dr. Kerrigan and Dr. Mullen, Killebrew's psychologist. (DSOF ¶ 38.) Nurse McCormack found no evidence of a flare in MS since Dr. Snyder's review on January 22, 2013. (Doc. 23-2, at 001610.) Additionally, Nurse McCormack noted that Dr. Kerrigan opined that his prescribed treatment regimen was helping and that Killebrew was stable. (*Id.*) Nurse McCormack further noted that there was no evidence of additional lesions and no reported evidence of worsening symptoms. (*Id.* at 001611.) And with respect to Killebrew's claims of fatigue and cognitive impairment, Nurse McCormack noted "[w]e have no evidence of cognitive impairment to support her c/o poor concentration," although "[f]atigue is common with MS, however, due to the subjective nature of this complaint, it is difficult to quantify." (*Id.* at 001610-1611.)

Dr. Selkirk subsequently opined based on updated records that Killebrew "does not have any medically necessary restrictions and/or limitations from 07/28/2014 forward." (*Id.* at 001476.) In his May 26, 2015 follow-up review, Dr. Selkirk referenced Dr. Sirken's IME report, noting that Dr. Sirken found Killebrew had normal speech and strength and that Killebrew's "gait was stable but slightly wide based." (*Id.*) Dr. Selkirk determined that "this is not impairing in any way," and noted that Killebrew did not report any falls and does not require a gait assistive device. (*Id.*) Additionally, similar to Dr. Snyder and Nurse McCormack, Dr. Selkirk opined that Killebrew's "self-reported cognitive complaints have not been verified by objective neuropsychological testing[, and] [t]he report of fatigue is not supported by any objective data." (*Id.*) As to the opinion of Dr. Kerrigan, Dr. Selkirk referenced Dr. Kerrigan's finding that Killebrew has never had an exacerbation of

26

her MS, and opined that "[t]his is consistent with the MRI reports included in the new data." (*Id.*) Moreover, after reviewing the MRIs that Killebrew submitted with her second appeal, Dr. Selkirk concluded that "there has never been any documentation of dissemination of her disease in time. It has been stable on every MRI in the medical record." (*Id.*) As such, Dr. Selkirk opined that Killebrew "does not meet the well established diagnostic criteria for MS." (*Id.*) Finally, returning to Killebrew's complaints of fatigue and cognitive impairment, Dr. Selkirk opined that "[a]lthough MS patients can have fatigue and cognitive impairment, it is not a universal feature of the disease and certainly would not be expected in someone with such minimal MRI disease burden. There remains no evidence of impairment and no evidence of active neurological disease." (*Id.*)

On the whole, although the conclusions reached by Dr. Snyder, Nurse McCormack, and Dr. Selkirk conflict with those of Dr. Kerrigan and Dr. Sirken, there is no reason to suggest that the opinions of the former group were not "reliable evidence" upon which it was unreasonable for Prudential to base its decision. *Addis*, 425 F. Supp. 2d at 617. Indeed, "[i]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." *Giertz-Richardson*, 536 F. Supp. 2d at 1291-92 (quoting *Hufford*, 322 F. Supp. 2d at 1359); *see Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 139 (5th Cir. 2016) ("None of the health care providers consulted by Prudential found that [plaintiff] had physical or cognitive impairments [resulting from MS]. Therefore, Prudential's decision simply came down to a permissible choice between the position of [the administrator's] independent medical consultant[s], and the position of [the claimant's physicians], which does not amount to an abuse of discretion. . . .") (internal quotation marks and citation omitted); *Schmitz v. Sun Life Assur. Co. of Can.*, 57 F. Supp. 3d 1095, 1119 (D. Minn. 2014) ("Although [claimant's treating physicians] opined that

multiple sclerosis disabled [claimant] as of July 2008, . . . a plan administrator's decision is not arbitrary and capricious merely because it rejects the opinion of a treating physician unless the record does not support the denial. . . . In other words, [w]hen a conflict in medical opinions exists, the plan administrator does not abuse his discretion by adopting one opinion, if reasonable, and finding that the employee is not disabled.") (internal citations and quotation marks omitted); *Ketterman v. Affiliates Long-Term Disability Plan*, No. 08-1542, 2009 WL 3055309, at *15 (W.D. Pa. Sept. 21, 2009) (finding defendant's reliance on the conclusions of its independent physicians was not arbitrary and capricious); *Dolfi v. Disability Reinsurance Mgmt. Servs., Inc.*, 584 F. Supp. 2d 709, 734-35 (M.D. Pa. 2008) ("An administrator's reliance on the opinions of its non-treating medical consultants over the opinions of a claimant's treating physicians . . . does not render its denial of disability benefits arbitrary and capricious.").

Additionally, the reports of both Dr. Snyder and Dr. Selkirk specifically referred to the competing opinions of Killebrew's physicians regarding Killebrew's complaints of fatigue and cognitive impairment and opined that, based on the medical records provided, those conclusions were not substantiated. Thus, there is no reason to suggest that these physicians, and by extension Prudential, completely "ignored" the opinions of Killebrew's treating physicians. *See Eppley v. Provident Life & Accident Ins. Co.*, 789 F. Supp. 2d 546, 570-71 (E.D. Pa. 2011) (noting that the administrator "clearly did not ignore" the treating physician's opinion, but instead "simply concluded, upon extensive review of the record, that such restrictions and limitations were unfounded," and further crediting the administrator's disregard of claimant's treating physician's report where "competing opinions" of qualified experts addressed the treating physician's conclusions and opined that those conclusions were unfounded based on the documented clinical evidence). Rather, the record demonstrates a professional disagreement between Prudential's reviewers and Killebrew's physicians.

However, Prudential's decision to credit Dr. Snyder, Nurse McCormack, and Dr. Selkirk's conclusions over those of Killebrew's treating physicians is not demonstrative of arbitrary and capricious decision-making. *Dolfi*, 584 F. Supp. 2d at 735 (citing *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004)); *Maciejczak v. Procter & Gamble Co.*, 3:CV-02-1041, 2006 WL 860150, at *11 (M.D. Pa. Mar. 31, 2006) ("The medical evidence in this case is sharply conflicted, and deference to the Trustees' determination in the face of that conflict must be respected. The fact that [the reviewing physician's] opinion was reaffirmed by other outside medical experts decreases concerns that the Trustees' decision was arbitrary.") (internal citation omitted).

Moreover, there is no dispute that both Dr. Snyder and Dr. Selkirk are specialists who are qualified to render opinions on the effects of MS. *Cf. Addis*, 425 F. Supp. 2d at 616 (finding administrator's unexplained reliance on opinion of non-specialist suggestive of procedural bias). "[A]n administrator's reliance on the opinion of a *qualified* medical expert demonstrates that its decision was reasonable." *Dolfi*, 584 F. Supp. 2d at 735 (emphasis added).

Furthermore, based on some of the findings of Killebrew's own treating physicians, it was not unreasonable for Prudential to decide not to adopt these physicians' conclusions as to whether Killebrew was disabled. Notably, Dr. Sirken's IME found Killebrew to have normal speech and strength, as well as stable gait. Moreover, Dr. Sirken's conclusions as to Killebrew's disability status appear to have been premised primarily on Killebrew's ability to perform the material and substantial duties of her pre-illness occupation, which is not the governing standard under the Plan. *Cf. Granville v. Aetna Life Ins. Co.*, No. 3:14-cv-00211, 2015 WL 9026025, at *7 (M.D. Pa. Dec. 15, 2015) (discrediting physician's opinion when it applied the wrong standard of disability). Additionally, Dr. Kerrigan found Killebrew's condition to have improved and noted that she has never had an exacerbation of her MS. Finally, the progress notes from Dr. Cline

consistently found Killebrew negative for "arthralgia, myalgia, back pain, muscle cramps[,] . . . weakness, paresthesia, headache, dizziness, [and] tremor." Considering these findings, the Court cannot say that Prudential abused its discretion in declining to adopt the conclusions of Killebrew's treating physicians that conflicted with those of the reviewing experts.

Accordingly, the Court finds that Prudential's decision to base its decision largely on the opinions of Dr. Snyder, Nurse McCormack, and Dr. Selkirk rather than on the opinions of Killebrew's treating physicians does not weigh in favor of finding Prudential to have abused its discretion. Rather, considering the relevant qualifications of the reviewing physicians and the number of reviews conducted based on updated records, the Court concludes that this factor weighs in favor of Prudential. *See Dolfi*, 584 F. Supp. 2d at 735.

### iii. Prudential's Consideration of Killebrew's Subjective Complaints

Killebrew contends that Prudential purposefully failed to consider her subjective complaints and limited its focus to "objective" evidence, despite the fact that the Plan does not require claimants to present such evidence in order to prove disability. (*See* Doc. 27, at 14-15; Doc. 29, at 3.)

In the context of ERISA litigation, "courts have noted the general inappropriateness of an insurer's dismissal of the claimant's self-reported/subjective evidence." *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 562 (W.D. Pa. 2009). Specifically, courts have found it unreasonable for an administrator to reject (1) a claimant's self-reported evidence where there is no basis for believing it to be unreliable; and (2) a treating physician's notes recording plaintiff's "self-reporting and subjective observations, or other assertedly 'subjective' evidence, where, as here, [] the applicable Plan does not restrict the type of evidence that may be used to demonstrate disability." *Id.* at 563 (citing cases). However, although "an administrator cannot automatically disregard subjective complaints, administrators are also not required to

automatically give significant weight to all subjective complaints." *Giertz-Richardson v. Hartford Life & Accident Ins. Co.*, 536 F. Supp. 2d 1280, 1292 (M.D. Fla. 2008). Indeed, "where claims as to the existence or degree of subjective pain are unsubstantiated, the plan administrator has the discretion to disregard them." *Eppley v. Provident Life & Accident Ins. Co.*, 789 F. Supp. 2d 546, 572 (E.D. Pa. 2011).

Contrary to Killebrew's assertions, the record does not demonstrate that Prudential failed to consider her subjective complaints of fatigue, pain, and cognitive difficulties. Dr. Snyder's reviews expressly considered Killebrew's subjective complaints and concluded that Killebrew's condition warranted certain restrictions and limitations. (*See* Doc. 23-2, at 000384, 001239.) Indeed, in arriving at this set of limitations upon which Prudential originally based its decision, Dr. Snyder considered, *inter alia,* office visit notes of Dr. Kerrigan, office visit notes of Dr. Katara, and Killebrew's responses to Prudential's Activities of Daily Living Questionnaire, which included her complaints of fatigue and exhaustion in her own words (*see* Doc. 23-2, at 001222-1223). Likewise, Dr. Selkirk's review also considered documentation regarding Killebrew's subjective complaints. (*Id.* at 001475-1476.) The gainful occupations identified by the vocational rehabilitation specialist specifically contemplated Dr. Snyder's restrictions and limitations, which considered Killebrew's subjective complaints. (*See id.* at 001599-1600, 001604-1605.) Furthermore, in Prudential's June 4, 2015 letter to Killebrew ultimately upholding its termination decision, Prudential expressly noted Killebrew's subjective complaints, but explained that "there was no evidence to support any limitations" stemming from these complaints, "as there was no referral to pain management, no addition of narcotic pain medications, no difficulty falling asleep, and no clinical evidence to support fatigue, forgetfulness, concentration, muscle spasm, or urinary incontinence issues." (*Id.* at 001584.)

Thus, the record does not indicate that Prudential failed entirely to take into consideration Killebrew's subjective complaints; rather, the record demonstrates that Prudential chose to rely on the reviewing experts' conclusions that the objective clinical

evidence did not support Killebrew's subjective complaints. However, this decision does not necessarily indicate that Prudential "intentionally" disregarded Killebrew's subjective complaints, as Killebrew alleges. *See Dolfi v. Disability Reinsurance Mgmt. Servs., Inc.*, 584 F. Supp. 2d 709, 735 (M.D. Pa. 2008) (reviewing expert considered the findings of the claimant's treating physician concerning her subjective complaints, but the expert's "contrary conclusions merely reflect a professional disagreement" upon which it was not arbitrary and capricious for the administrator to rely); *see also Eppley*, 789 F. Supp. 2d at 572 (noting the lack of objective evidence substantiating a claimant's degree of subjective pain may constitute a "sound basis for discrediting the degree of pain alleged").

Indeed, the record does not suggest that Prudential withheld documentation regarding Killebrew's subjective complaints from the reviewing physicians or that Prudential considered only objective clinical evidence in arriving at its decision. Instead, the record demonstrates that Prudential largely relied upon the opinions of the independent medical experts who found that Killebrew's subjective complaints were not substantiated by objective medical data. Under the law, this reliance is not arbitrary and capricious. *See Fortune v. Grp. Long Term Disability Plan for Emps. of Keyspan Corp.*, 391 Fed. Appx. 74, 78 (2d Cir. 2010) (finding, in ERISA case involving a claimant diagnosed with MS, that it was reasonable for the administrator to rely upon expert opinions finding "little evidence of cognitive dysfunction" despite plaintiff's "numerous cognitive complaints"); *Giertz-Richardson*, 536 F. Supp. 2d at 1292 (concluding, in ERISA case involving a claimant diagnosed with MS, that it "was not wrong" for administrator to give less weight to opinions of physicians who found plaintiff could not work based on her subjective complaints of disabling cognitive symptoms when those "opinions were refuted by the reports of the independent reviewing physicians"); *see also Neptune v. Sun Life Assur. Co. of Can.*, No. 10-cv-2938, 2013 WL 5273785, at *12 (E.D. Pa. Sept. 16, 2013) (noting, where claimant's treating physicians opined the claimant was disabled based on his subjective complaints, the administrator "had full discretion to credit the opinions of the independent doctors who conducted reviews on behalf of" the administrator, which

disagreed with the treating physicians' opinions "based on the normal test results and lack of evidence identifying any functional impairment").

Accordingly, this factor does not weigh in favor of finding Prudential's decision to have been arbitrary and capricious.

### iv. Prudential's Decision Not to Conduct an Independent Medical Examination or Other Diagnostic Testing

Prudential's decision not to conduct an independent medical examination or other diagnostic testing is a factor to consider in determining whether Prudential's decision was arbitrary and capricious. *Reed v. CITIGROUP INC*, 658 Fed. Appx. 112, 115 (3d Cir. 2016). However, "numerous courts in [the Third C]ircuit have held that there is no legal requirement for a plan administrator to demand an independent medical examination as part of its review of a claim for disability benefits under an ERISA-governed plan, even if the plan permits it to do so." *Sollon v. Ohio Cas. Ins. Co.*, 396 F. Supp. 2d 560, 586 (W.D. Pa. 2005) (discussing cases). Indeed, ERISA does not require plan administrators to perform any physical examinations, *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 296 (W.D. Pa. 2008), and whether an administrator decided to conduct an in-person or independent examination when it was not required to do so under the Plan is "simply a factor that informs the Court's review under the arbitrary and capricious standard. . . . [An administrator's] election to rely on a paper records review is not *per se* arbitrary and capricious." *Dolfi v. Disability Reinsurance Mgmt. Servs., Inc.*, 584 F. Supp. 2d 709, 735 (M.D. Pa. 2008).

Prudential argues correctly that it had no duty to conduct an IME or any other formal testing. (DR ¶ 56.) Moreover, Prudential contends that MS[7] is not a "purely

---

[7]     "Multiple sclerosis is 'a disease in which there are foci of demyelination of various sizes throughout the white matter of the central nervous system, sometimes extending into the gray matter. Typically, the symptoms of lesions of the white matter are weakness, incoordination, paresthesias, speech disturbances, and visual complaints. The course of the disease is usually prolonged, so that the term multiple also refers to remissions and relapses that occur over a period of

subjective" condition but instead is verifiable by multiple objective tests and multiple subjective symptoms. (Doc. 32, at 8-9.) Prudential attempts to distinguish the cases cited by Plaintiff as involving conditions such as Chronic Fatigue Syndrome ("CFS") and Fibromyalgia, the existence and severity of which, it argues, are difficult or impossible to establish by objective testing alone. (*See id.* at 8-11.) In so doing, Prudential argues that there was no need to conduct an IME because "MS is measurable and diagnosable based on objective findings," which, in this case, revealed: Killebrew's EMG was normal; her brain, cervical, and thoracic spine MRI findings were stable from 2012-2015; and there was no objective evidence to support fatigue or any cognitive impairment. (*See* Doc. 30, at 13, 17, 19.) Additionally, Killebrew did undergo an IME conducted by Dr. Sirken, albeit not at the request of Prudential, who noted she was awake, alert, had fluent speech, stable gait, and no focal weakness, facial asymmetry, ptosis, or dysarthria.[8] (Doc. 23-2, at 001405-1406.) The results of this IME were considered by Dr. Selkirk as part of his follow-up review, upon which Prudential based its decision in large part. While an IME might have been one prudent course for Prudential to take in light of Killebrew's subjective complaints, the Court cannot find that its decision to forgo such an exam in this case resulted in an arbitrary and capricious decision.

To reiterate, although the Plan permits Prudential to conduct an IME, there is no requirement that Prudential obtain an IME in order to rebut the opinion of a claimant's treating physician. *Hufford*, 322 F. Supp. 2d at 1359; *see Ackaway v. Aetna Life Ins. Co.*, No. 14-1300, 2016 WL 5661724, at *30 (E.D. Pa. Sept. 30, 2016). Additionally, the

---

many years.'" *Porter v. Broadspire & Comcast Long Term Disability Plan*, 492 F. Supp. 2d 480, 487 n.2 (W.D. Pa. 2007) (quoting Doland's Illustrated Medical Dictionary, p. 1611 (29th ed. 2000)).

[8]     As previously noted, although Dr. Sirken concluded that Killebrew could not perform full-time employment, even of the sedentary type, his IME report repeatedly makes reference to Killebrew's capacity to perform the "material and substantial duties" of her regular occupation as a branch manager, which is not the relevant disability standard. (Doc. 23-2, at 001406.)

record indicates that Prudential provided Dr. Selkirk with all relevant documentation, including Dr. Sirken's IME report and other documents stemming from recent in-person evaluations of Killebrew, prior to his follow-up review. Thus, for example, unlike the case in *Esbensen v. Life Insurance Co. of North America*, Prudential's expert reviewer based his opinion on up-to-date records, including the reports of physicians who examined Killebrew in person.[9] *Cf.* No. 3:14-cv-1513, 2016 WL 1089160, at *5 (M.D. Pa. Mar. 21, 2016) (finding administrator abused its discretion in denying LTD benefits in reliance on consultant's report that was based on "stale" records of a non-treating physician).

Moreover, although Prudential did not conduct its own IME, its termination decision was informed by observations and findings of physicians who evaluated Killebrew in person and found that she exhibited, *inter alia*, normal speech, strength, and gait. Furthermore, Prudential does not dispute Killebrew's MS diagnosis (*see* DR ¶ 27), but instead disagrees that the evidence she provided demonstrates that she is currently unable to perform the duties of "any gainful occupation." *See Ackaway*, 2016 WL 5661724, at *30 (noting administrator's decision to forgo IME did not weigh in favor of finding its decision arbitrary and capricious when the administrator did not dispute the treating physician's diagnosis, only whether claimant presented sufficient evidence of disability under the terms of the Plan). Finally, at bottom, Killebrew is the party with the burden of proof per the terms of the Plan. The Plan required Killebrew to produce evidence "satisfactory to Prudential" demonstrating she was in fact disabled under the

---

[9]    Plaintiff has not claimed that any of the medical experts who reviewed Killebrew's records over the course of her claim–Nurse Palermo, Dr. Snyder, Nurse McCormack, and Dr. Selkirk–were not supplied with the appropriate records at the time of his or her review. On this point, Plaintiff only argues that Prudential did not provide Dr. Selkirk with the ALJ's opinion prior to his first review, however, "[t]he burden to supply all documents [Killebrew] wished to be considered as part of her claim on appeal rested entirely with [Killebrew]–not with [Prudential]." *Hoch v. Hartford Life & Accident Ins. Co.*, No. 08-4805, 2009 WL 1162823, at *16 (E.D. Pa. Apr. 29, 2009) (citing *Fabyanic v. Hartford Life & Accident Ins. Co.*, No. 02:08-cv-0400, 2009 WL 775404, at *11 (W.D. Pa. Mar. 18, 2009)); *see infra* note 12.

Any Gainful Occupation standard. Prudential was under no obligation to assist Killebrew with proving her claim. *See Killian v. Hartford Life & Accident Ins. Co.*, No. 16-1377, 2017 WL 429905, at *14 (E.D. Pa. Jan. 31, 2017) (finding administrator's decision to not order an IME did not weigh in favor of finding that it acted arbitrarily and capriciously because it was the claimant's obligation to provide sufficient evidence to support her claim under the policy).

Accordingly, the Court concludes that Prudential's discretionary decision to not order an IME or other diagnostic testing in this case does not suggest that it acted arbitrarily and capriciously.

## v. Prudential Did Not Disregard Opinions Previously Relied Upon

The Court notes that Prudential did not disregard opinions that it previously relied upon in order to arrive at its termination decision. Prudential's multiple reviewers consistently found that Killebrew's medical records did not support a finding of total disability. (*See* DSOF ¶¶ 18 (Nurse Palermo finding no basis to restrict Killebrew under the more generous Regular Occupation standard as of June 1, 2012); 24-25, 28-30 (Dr. Snyder finding Killebrew could perform full-time work under certain limitations); 39-40 (Nurse McCormack concurring with Dr. Snyder's limitations); 46, 56 (Dr. Selkirk opining that Killebrew was not limited and/or restricted from July 28, 2014 onward).) In fact, whereas Dr. Snyder's January 22, 2013 review concluded that Killebrew's condition warranted certain limitations, Dr. Selkirk's subsequent reviews based on updated medical records concluded that Killebrew has no "medically necessary restrictions and/or limitations from 07/28/2014 forward." (Doc. 23-2, at 001360, 001476.) Thus, in arriving at its ultimate decision, Prudential consistently relied upon the opinions of its internal and independent reviewing experts who consistently concluded that Killebrew's records did not support a finding that she was unable to perform any full-time work. *Cf. Kosiba v. Merck & Co.*, No. 98-3571, 2011 WL 843927, at *20 (D.N.J. Mar. 7, 2011) (explaining that an administrator's unexplained decision to disregard information in the medical

record that it previously relied upon in arriving at its first finding of total disability demonstrated arbitrary and capricious decision-making).

### vi. The Award of Social Security Disability Benefits

An award of social security disability benefits is another factor bearing upon a plan administrator's decision-making process. *See Marciniak v. Prudential Fin. Ins. Co. of Am*., 184 Fed. Appx. 266, 269 (3d Cir. 2006). "However, a Social Security award does not in itself indicate that an administrator's decision was arbitrary and capricious, and a plan administrator is not bound by the SSA decision." *Id.* Nevertheless, some courts in this Circuit have found that "if the plan administrator (1) encourages the applicant to apply for [SSD] payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious." *Kosiba*, 2011 WL 843927, at *18 (quoting *Curry v. Eaton Corp.*, 400 Fed. Appx. 51, 68 (6th Cir. 2010)); *see Strott v. Dimensional Inv., LLC Health & Welfare Plan*, No. 2:13-cv-1245, 2015 WL 1299773, at *18-*19 (W.D. Pa. Mar. 23, 2015).

In this case, Prudential encouraged Killebrew to apply for SSD benefits and paid for Allsup to assist Killebrew with obtaining such benefits. (Doc. 23-2, at 001176.)[10] It is undisputed that Prudential benefitted financially from Killebrew's receipt of SSD benefits. (*See* DR ¶ 41.) And Prudential's explanation for why it took a different position from the SSA on the question of disability proves underwhelming. In its June 4, 2015 letter to Killebrew upholding its termination of her LTD benefits under the Any Gainful Occupation standard for the second time, Prudential explained:

> We understand Ms. Killebrew has been awarded Social Security Disability benefits; however, we have conducted a separate, thorough review of all

---

[10] Although Killebrew asserted in her Statement of Facts that she was "required" to apply for SSD benefits in order to receive her LTD benefits under the Plan, she failed to support this assertion with an adequate citation to the record. (*See* PSOF ¶ 34.)

the medical records/evidence provided to us and have determined she does not meet the Group LTD Policy definition of Disability as outlined above. Please keep in mind that not all disability programs or definitions are alike. A finding by a Governmental Agency such as Social Security that a person is disabled does not necessarily mean they qualify under the terms of their Group Insurance policy. Just as the Government must follow the provisions of the law in making their determination, we must follow the terms of the Group Insurance policy.

In conjunction with the review of her LTD claim, a review of her file was completed by a physician specialist, as outlined above. It does not appear that the SSA had this information when rendering their determination.

(Doc. 23-2, at 001584.)

First, there does not appear to be much merit to Prudential's suggestion that the ALJ applied a materially different definition of "disability" which would permit a finding of disability for purposes of SSD benefits but preclude such a finding under the Any Gainful Occupation standard. *See Strott*, 2015 WL 1299773, at *16. Indeed, the definition of "disability" relied upon by the ALJ was "the inability to engage in any substantial gainful activity," whereas "disability" under the Any Gainful Occupation standard is defined as the inability "to perform the duties of any gainful occupation[11] for which you are reasonable fitted by education, training or experience." (*See* Doc. 23-2, at 001466; DSOF ¶ 3.) Thus, the Court does not find that the two definitions of "disability" are materially distinct so as to necessarily explain why Prudential departed from the ALJ's decision based on differing definitions, as its letter implies. *See Kosiba*, 2011 WL 843927, at *18.

Additionally, Dr. Selkirk's follow-up medical review, which considered the ALJ's decision for the first time,[12] does not address the ALJ's decision other than

---

[11]     "Gainful occupation means an occupation, including self-employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds . . . 60% of your monthly earnings, if you are not working." (DSOF ¶ 3.)

[12]     Killebrew suggests that Prudential's failure to consider the ALJ's rationale prior to her second appeal indicates arbitrary and capricious decision-making. (*See* PSOF ¶ 43.) However, "[t]he burden to supply all documents [Killebrew] wished

38

to note in cursory fashion that the ALJ's rationale did not alter his previous review conducted on October 14, 2014. (Doc. 23-2, at 001477.) Curiously, Dr. Selkirk's original review stated that the approval of SSD benefits did not alter his opinion, despite the fact that he admittedly did not have the ALJ's opinion in his possession at that time. (Doc. 23-2, at 001477 (noting that the ALJ's rationale was received on May 11, 2015); *see* PSOF ¶ 49.) This calls into question the extent to which Dr. Selkirk, and by extension Prudential, actually considered the ALJ's rationale in arriving at their conclusions.

However, the ALJ's decision was issued before Dr. Selkirk reviewed the medical records and furnished his two reports, which opine that Killebrew does not have any medically necessary restrictions or limitations from July 28, 2014 forward based on updated medical records, including a cervical spine MRI and brain MRI taken on February 17, 2015. (Doc. 23-2, at 001476; PSOF ¶ 48.) Thus, there is legitimacy to Prudential's explanation that the SSA did not rely on the same information as Prudential in making its decision.

Accordingly, on the whole, the Court concludes that this factor weighs slightly in favor of finding that Prudential's decision was arbitrary and capricious. Nevertheless, the Court recognizes that "[w]hile the award of Social Security Disability benefits may be a relevant factor in an administrator's decision, failure to consider this determination does not render the administrator's decision an abuse

---

to be considered as part of her claim on appeal rested entirely with [Killebrew]–not with [Prudential]." *Hoch v. Hartford Life & Accident Ins. Co.*, No. 08-4805, 2009 WL 1162823, at *16 (E.D. Pa. Apr. 29, 2009) (citing *Fabyanic v. Hartford Life & Accident Ins. Co.*, No. 02:08-cv-0400, 2009 WL 775404, at *11 (W.D. Pa. Mar. 18, 2009)). Indeed, the record indicates that Prudential attempted to obtain the ALJ's opinion prior to Killebrew's second appeal, but Killebrew failed to fax it to Prudential. (DR ¶ 43.) Regardless, the burden was on Killebrew to provide Prudential with all relevant documents, and Prudential did have the ALJ's rationale prior to issuing its decision to uphold its termination decision for the second time.

of discretion." *Burk v. Broadspire Servs., Inc.*, 342 Fed. Appx. 732, 738 (3d Cir. 2009).

### vii. Consideration of Killebrew's Ability to Perform Any Gainful Occupation

Lastly, the Court notes that Prudential's decision to terminate Killebrew's LTD benefits under the Any Gainful Occupation standard was informed by internal employability assessments conducted by a vocational rehabilitation specialist. Ms. Neumann, M.S Ed, C.R.C., considered Killebrew's education, relevant skills, and the restrictions outlined by Dr. Snyder, and determined three specific gainful occupations that Killebrew could perform. (DSOF ¶¶ 32-37.) These alternate positions were noted by Prudential in its January 25, 2013, June 27, 2014, October 15, 2014, and June 4, 2015 letters to Killebrew.[13] (*Id.* ¶¶ 36, 43, 54, 60.) Thus, for example, unlike the case in *Lamanna v. Special Agents Mutual Benefits Ass'n*, 546 F. Supp. 2d 261, 297 (W.D. Pa. 2008), in which the administrator made its termination decision without conducting any "reasonable inquiry" into whether the claimant could return to work, Prudential conducted an occupational review and employability assessments that inquired into whether Killebrew could perform either her "regular occupation" or "any gainful occupation," as defined by the Plan. Notably, the fact that Prudential reversed its initial termination decision and found Killebrew disabled under the Regular Occupation standard in light of an occupational review evidences that Prudential considered these assessments on the

---

[13]     Prudential's latter two letters also stated that, in light of Dr. Selkirk's review of the updated records, there were no medically necessary restrictions or limitations which precluded Killebrew from performing either her regular occupation or any gainful occupation. (Doc. 23-2, at 001566-1567, 001583-1584.) While Prudential's decision as to Killebrew's ability to perform her regular occupation is arguably in conflict with the previous opinions of Dr. Snyder and Nurse McCormack, because Killebrew's continuing receipt of LTD benefits was predicated exclusively on her ability to prove disability under the Any Gainful Occupation standard, the Court does not find, and Plaintiff does not argue, that this ancillary determination has any impact on the instant case.

merits, not on a preferred outcome. (*See* DSOF ¶ 27.)

Therefore, the Court finds that Prudential made a reasonable inquiry into Killebrew's ability to perform any gainful occupation, and this factor weighs in favor of upholding Prudential's decision.

### c. Weighing of the Factors

In order to decide whether an administrator's termination of benefits is arbitrary and capricious, courts must consider "several different, often case-specific, factors, reaching a result by weighing all together." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 855 (3d Cir. 2011) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). In conducting this balancing, the Court is guided by the governing principal that it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Orvosh v. Program of Grp. Ins. for Salaried Emps. of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000) (internal quotation marks and citation omitted). The arbitrary and capricious standard of review is an "extremely deferential" one, allowing the Court to overturn a claim denial only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) (internal quotation marks and citation omitted).

Here, the Court gives significant weight to the fact that Prudential's decision was based on: a change to a more rigorous definition of disability; independent reviews conducted by qualified medical experts who considered the appropriate medical documentation available and the competing opinions of Killebrew's physicians; and employability assessments conducted by a vocational rehabilitation specialist based on the limitations announced by one of Prudential's independent medical reviewers. Under the circumstances of this case, the Court ascribes relatively little weight to Prudential's decision not to conduct its own IME, its decision not to follow the social security ALJ's rationale, and the inherent structural conflict of interest. Viewing all relevant factors as a whole, the Court finds that Prudential based its decision on substantial evidence and that

the structural and procedural factors accompanying this case were not so substantial so as to otherwise qualify Prudential's decision as arbitrary and capricious. Accordingly, Prudential's Motion for Summary Judgment (Doc. 23) will be granted.

**B. Killebrew's Motion for Summary Judgment**

For the reasons stated above, Prudential's Motion for Summary Judgment will be granted. Consequently, for the reasons articulated herein, after reviewing the record and weighing the relevant factors in a light most favorable to Killebrew, the Court finds that Prudential's decision to terminate Killebrew's LTD benefits was based on substantial evidence and not arbitrary and capricious as a matter of law. Therefore, Killebrew's Motion for Summary Judgment (Doc. 26) will be denied.

## IV. Conclusion

"[A] diagnosis [of MS] does not by itself establish disability." *Giertz-Richardson v. Hartford Life & Accident Ins. Co.*, 536 F. Supp. 2d 1280, 1293 (M.D. Fla. 2008); *see Burell v. Prudential Ins. Co. of Am*., 820 F.3d 132, 138 (5th Cir. 2016) ("[A] diagnosis of MS is not sufficient on its own for [claimant] to qualify for long-term disability benefits under the Plan."). Because the language in the Plan conveyed discretionary authority over LTD benefits eligibility determinations to Prudential, the Court is confined to an arbitrary and capricious standard of review. Under this "extremely deferential" standard, the Court concludes that Prudential's decision was based on evidence that "a reasonable mind might accept as adequate to support a conclusion." *Soubik v. Dir., Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004). And although some structural and procedural factors were present, the record, when viewed in a light most favorable to Killebrew, does not support a finding that Prudential's decision "was not the product of reasoned decision-making and substantial evidence." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 856 (3d Cir. 2011).

Therefore, for the above stated reasons, Prudential's Motion for Summary Judgment (Doc. 23) will be granted. Killebrew's Motion for Summary Judgment (Doc. 26) will be denied.

An appropriate order follows.


April 27, 2017                                              /s/ A. Richard Caputo
Date                                                        A. Richard Caputo
                                                           United States District Judge